By the Court.
Freedman, J.
On September 7, 1882, the defendant issued its bill of lading at Singapore, India, to Katz Brothers, whereby it undertook, for value received, to transport one thousand seven hundred and three slabs of tin to London, and thence to the port of New York by a steamer of the Monarch Line. The bill of lading provided, among other things, that the tin was to be delivered from the ship’s deck (where the shipowner’s responsibility shall cease) at the port of New York, and that the contract for transportation should be subject to exceptions for losses arising through pirates, robbers, thieves . . . during the voyage or at the port of discharge.
Another provision of the bill of lading was : “ The goods to be received by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed and stored at the sole expense and risk of the consignee, in the warehouses provided for that purpose, or in the public store, as the collector for the port of New York shall direct, and when deposited in the public store to be subject to rent; and the keys of the warehouse to be delivered to and kept in charge of the officer of customs under the direction of the collector, the collector of the port being hereby authorized to grant a general order for discharging immediately after the entry of the ship.”
The one thousand seven hundred and three slabs of tin arrived in the port of New York on board of the steamer “York City.” Prior to such arrival, Katz Brothers, the shippers, had sold the whole of said tin to Mayer Brothers & Co., of the city of New York, and indorsed the bill of lading over to them, and Mayer *208 Brothers & Oo. had sold the one thousand seven hundred and three slabs to various parties. Among these sales was one of a lot of twenty-five tons to Peter Hayden, who, in turn, sold it to Lucius Hart & Co. In the sale of this lot there was no special designation of the tin at the time. The steamer arrived on Saturday, November 25, 1882, and Mayer Brothers & Oo. immediately entered the tin at the custom house and obtained a free permit. On Monday, November 27, Mayer Brothers & Co. paid the freight to Patton, Vickers & Co., the consignees of the steamer, and obtained from the latter the following delivery order, viz. :
“ Monarch Line, 35 Broadway,
“ N. Y. Nov. 27, 1882.
“Deliver to Messrs. Mayer Bros.* goods ex. steamship c York City,’ as follows, when customs permit is in order : HH. 1048 slabs of tin. H. 655 slabs of tin.
“Patton, Vickers & Oo.
“To the Delivery Clerk, Pavonia Ferry, Jersey City.”
This order Mayer Bros. & Co. indorsed as follows : “Deliver against our order only. Mayer Brothers & Oo.” And presented it to the delivery clerk of the steamer.
On the same' day, Messrs. Mayer Brothers & Co. employed Waterbury & Force, weighers, to weigh the whole consignment of tin at the defendant’s wharf—the regular wharf of the Monarch Line—in five ton lots, and mark the lots 1, 2, 3, 4, 5, etc. In the afternoon of that day the weigher attended there at the steamer, and learned that none of the tin had at that time been discharged, but was told by the delivery clerk of the steamer that it would be discharged right off. He did not wait, but he returned to the wharf on the morning of Tuesday, November 28, at about eight o’clock, and then found about thirty tons discharged and in good order. He weighed that, dividing it into six lots of five tons each, and piling each lot by itself. Each slab was marked by a *209 stencil number indicating the number of the lot. Thus, each slab in lot 1 was marked 1, each slab in lot 2 was marked 2, etc., etc. The weigher completed his weighing about eleven o’clock, a. m., and about noon sent returns of the weights to Mayer Brothers & Co. One return covering lots 1, 2, 3, 4, 5, was in this form :
“New York, November 28, 1882.
“Return of 498 slabs tin, weighed by order of Messrs. Mayer Bros. & Co.
H.H. H. Ex. ‘York City.’
“Loti. 94—11,258.
“ 2. 94—11,236.
“ 3. 100—11,236.
“ 4. 105—11,238.
“ 5. 105—11,294.
“498 56, 262 lbs.
‘ ‘ WATERBURY & FORCE. ”
At about one o’clock, p. m., of the same day, Mayer Bros. & Co., in fulfillment of their contract with Peter Hayden, sent to the latter the said weigher’s return, together with a bill and a delivery order for the four hundred and ninety-eight slabs of tin thus weighed and set apart, and between one and three o’clock of the same afternoon, Peter Hayden, in fulfillment of his contract with Lucius Hart & Co., indorsed the said delivery order, and delivered it so indorsed, together with the said weigher’s return, to Lucius Hart & Co. During the remainder of that afternoon Lucius Hart & Co. made no effort to take the tin. The next morning, November 29, Lucius Hart & Co. sent two trucks to take the tin, one drawn by two horses, and. one by a single horse. A driver went on each truck, and a third man, William Caughan, an employee of Lucius Hart & Co., and who attended to all the carting to be done for that firm, accompanied them. They arrived at the defendant’s wharf at about eight A. M., and William Caughan then handed to, and left with the custodian of *210 the wharf the order for the four hundred and ninety-eight slabs of tin contained in lots 1, 2, 3, 4 and 5, as they had been set apart, and assumed control over the same. The two-horse truck took two loads of tin to the store of Lucius Hart & Co. before noon, each load being about two, and one half tons. The single-horse truck took only one load, consisting of about one ton. After talcing these loads the trucks did not return to the wharf on that day. The next day, November 30, Lucius Hart & Co. did not send to the wharf at all, that day being Thanksgiving Day, though the wharf was open for business, and other merchants sent for and took away goods, and the day was fit and proper for such purpose. On the morning of December 1, sixty-three slabs were missing from the tin which had been set apart as aforesaid and over which William Oaughan had assumed control. The cause of their loss does not appear.
Upon these, facts it must be held that the twenty-five tons, comprising the four hundred and ninety-eight slabs of tin were duly delivered by the ship, and that the relation of the defendant to the said tin, as carrier, under the bill of lading in this case, had terminated before the sixty-three slabs disappeared, and consequently, that the findings of the learned judge below to the contrary are erroneous.
The fact that the plaintiff comes into court as assignee of the claim of Mayer Bros. & Co., of Peter Hayden and of Lucius Hart & Co., for the sixty-three missing slabs, can make no difference.
Mayer Bros. & Co.’s interest in these twenty-five tons of tin, and in the sixty-three slabs which were part of the same, was clearly terminated. They had entered the goods at the custom house, paid the freight, weighed the tin, set it apart, sold it and issued their order for it upon the delivery clerk. This had been accepted by the purchaser, Peter Hayden, in full performance of the contract of sale and delivery by Mayer Bros. & Co. and he had paid Mayer Bros. & Co. for the tin.
*211 So Peter Hayden’s interest was clearly terminated when he indorsed the papers over to Lucius Hart & Co. He had made his contract of sale to Lucius Hart & Co., price “payable thirty days after delivery on the dock at the port of New York,” and he turned the papers over to Lucius Hart & Co., in fulfillment of his contract of sale.
The plaintiff, therefore, got nothing by his assignment from Mayer Bros. & Co. He got nothing by his assignment from Peter Hayden. And he got nothing by his assignment from Lucius Hart & Co. except a title to the tin, with no rights against the defendant as carrier. They never held the bill of lading, and were never entitled to hold it.
The judgment appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event.
Sedgwick, Ch. J. and Ingraham, ,., concurred.